**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CRIMINAL DOCKET NO. 3:15-CR-259-FDW-DCK**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| **JOHN JAMAR DAVIS,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

**THIS MATTER IS BEFORE THE COURT** on Defendant John Jamar Davis's "Motion To Suppress" (Document No. 18) filed June 23, 2016, and the "Government's Response To Defendant's Motion To Suppress" (Document No. 20) filed July 5, 2016. The pending motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b), and is ripe for disposition. Having carefully considered the motion, the record, and applicable authority, as well as the testimony and arguments presented at a hearing conducted on August 9, 2016, the undersigned will recommend that the motion be denied.

## I. PROCEDURAL BACKGROUND

In a Bill of Indictment filed October 22, 2015 (Document No. 1), Defendant John Jamar Davis ("Defendant") was charged with a single count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). As noted, on June 23, 2016, Defendant filed his "Motion To Suppress" (Document No. 18), inclusive of a memorandum of law and a number of exhibits. The "Government's Response To Defendant's Motion To Suppress" (Document No. 20) was filed on July 5, 2016. The Court held a hearing on the motion on August 9, 2016, at which

evidence was presented and oral argument was conducted. In short, Defendant claimed at the hearing that law enforcement lacked reasonable suspicion to stop his vehicle and that the subsequent seizure of a firearm from the vehicle was improper. For now, this matter remains on Judge Whitney's September 6, 2016 trial calendar.

## II. FACTUAL SUMMARY

At the August 9, 2016 hearing on the suppression motion, the Government presented the testimony of two law enforcement officers – Officer Juan Varela and Detective Jason Kerl of the Charlotte-Mecklenburg Police Department ("CMPD"). Defendant presented the testimony of Ms. Bernice Wiles, a private citizen and friend of Defendant. While the evidence is in conflict as to one important issue, this is a relatively straightforward matter.

Officers Varela and Kerl were employed on July 3-4, 2015 by CMPD and were assigned to the department's ABC unit. They were working together that evening, wearing plain clothes, and riding in an unmarked Chevy Impala vehicle. Generally speaking, their assignment that evening was to do inspections of ABC establishments in the Freedom and Metro Divisions during their 5:00 p.m. to 3:00 a.m. shift. Neither officer was wearing a body camera, nor was their vehicle equipped with a dashboard camera.

At approximately 1:15 am, the officers received a radio transmission indicating "shots fired" in the vicinity of 2402 Wilkinson Boulevard in Charlotte, North Carolina, the location of the "Who You Wit" Club. The radio transmission related that a white vehicle might have been involved. At the time of the radio transmission, the officers were proceeding westbound on Wilkinson Boulevard not far from the scene of the club. The officers may have stopped briefly at the scene, and then they continued westbound on Wilkinson Boulevard.

Within a relatively short distance, the officers noticed a white vehicle in a parking lot at the corner of Wilkinson Boulevard and Monument Drive. The officers observed as the vehicle pulled out of the parking lot onto Monument Drive and then made a right turn onto Wilkinson Boulevard. From a relatively short distance away while waiting at a traffic light, the officers observed the front of the white vehicle and noticed that the right front (passenger side) headlight was not functioning, and in fact, the entire right headlight bezel was missing.

The officers followed the white vehicle westbound on Wilkinson Boulevard in their unmarked vehicle. After a short distance, the white vehicle made a U-turn at Wilkinson Boulevard and Remount Road. As the white vehicle completed its U-turn, the officers again were able to clearly observe the front of the white vehicle as it then proceeded eastbound on Wilkinson Boulevard toward them. The officers again observed that the right headlight was not functioning, and the entire right headlight bezel was missing. Because of the headlight, the officers made a U-turn themselves, caught up with the white vehicle, and executed a traffic stop in approximately the 2200 block of Wilkinson Boulevard.

Once the officers had stopped the white vehicle, both Officer Kerl and Officer Varela approached the vehicle – Kerl on the driver's side and Varela on the passenger's side. There was only one occupant in the white vehicle, Defendant John Jamar Davis. Kerl talked to Defendant, asking him if he had heard any shots and whether he had any weapons in the vehicle. Defendant responded in the negative. Kerl asked Defendant for a driver's license, and Defendant produced a Division of Motor Vehicles ID card, but not a driver's license. Kerl asked Defendant to step out of the car, which he did. Officer Kerl observed that Defendant was sweating profusely and seemed agitated.

While Kerl was talking with Defendant, Varela was on the other side of the vehicle. While Defendant was still seated in the car, Varela remained at a spot about halfway back on the rear passenger side door where he could watch Defendant as Kerl spoke to him. Varela had his flashlight with him and was using it at the scene. When Defendant stepped out of the car with Kerl, Varela took a step forward and shone his flashlight through the front passenger side window of the vehicle into the passenger side floorboard. With the assistance of the flashlight, Varela could see the brown-colored grip of a handgun and a portion of the black-colored slide of the handgun. The officers seized the partially hidden handgun from the passenger side floorboard of the vehicle.

At the hearing, Defendant presented the testimony of Bernise Wiles, a friend of Defendant whose car Defendant was driving on the night of the incident. Wiles testified that she had been a good friend of Defendant for approximately a decade. Wiles stated that around the time of Defendant's arrest, they talked just about every day. On cross-examination, Wiles conceded that she cared about Defendant a lot and did not want to see him go to prison. She denied any physical or romantic relationship.

Wiles further testified that she was the owner of the 2003 white Saturn vehicle in which Defendant was arrested. Around 10:00 pm on July 3, 2015, Defendant contacted Wiles about borrowing the car to run an errand, which she allowed him to do. When Defendant was late returning, Wiles attempted more than once to call him on his cell phone. Ultimately, Wiles spoke to a law enforcement officer on the phone, who directed her to come to Wilkinson Boulevard to get her vehicle. The officer told her that Defendant was being arrested and she needed to pick up the vehicle. Wiles went to the scene.

The focus of Wiles' testimony was the condition of the Saturn vehicle. She stated that no law enforcement officer at the scene warned her that the headlight bezel was missing and the headlight was not working. Law enforcement allowed her to drive the car from the scene. While counsel for both sides prodded Wiles for a more definite statement, she essentially stated that she never noticed that night or afterward that there was any problem with the right headlight or the right headlight bezel. Neither Defendant nor the Government presented photographs of the vehicle to clarify the record. Wiles got rid of the vehicle several months later.

### III. STANDARDS OF REVIEW

#### A. Reasonable Suspicion To Stop

An officer may stop and briefly detain a person for investigative purposes (known as an investigative or Terry stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. United States v. Arvizu, 534 U.S. 266 (2002) (reaffirming "totality of the circumstances" test); United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989).

As the Supreme Court has described it, "reasonable suspicion means something more than inchoate and unparticularized suspicion or hunch" but "less . . . than probable cause." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000). To meet this burden, the officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts," establish reasonable suspicion of criminal activity. Terry, 392 U.S. at 21. In determining whether the stop or prolonged detention was reasonable, courts are encouraged to "credit[] the practical

experience of officers who observe what happens on a daily basis on the street." Lender, 985 F.2d at 154. Accord Arvizu, 534 U.S. 266 at 273-74 (permitting "officers to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (internal quotation omitted).

**B.     Plain View Doctrine**

"[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir. 1997), citing Horton v. California, 496 U.S. 128, 136-37 (1990); and United States v. Williams, 41 F.3d 1992, 196 (4th Cir. 1994). Accord United States v. Bullard, 645 F.3d 237, 243-44 (4th Cir.), cert. denied, 132 S.Ct. 356 (2001); United States v. Rumley, 588 F.3d 202, 205-06 (4th Cir. 2009) cert. denied, 559 U.S. 1081 (2010); and United States v. Uzenski, 434 F.3d 690, 707-08 (4th Cir. 2006). The Supreme Court and the Fourth Circuit have applied the plain view doctrine in a variety of factual contexts. In addition to the cases cited above, see, *e.g.*, United States v. Dunn, 480 U.S. 294, 305 (1987) (upholding seizure of items "in plain view" with use of a flashlight).

## IV.     DISCUSSION

**A.     The Officers Had Reasonable Suspicion To Stop The Vehicle**

The first question before the Court is whether the officers had reasonable, articulable suspicion to stop Defendant's vehicle on the early morning of July 4, 2015. The Government argues that there was ample evidence of a violation of North Carolina traffic law – Defendant's vehicle had only one operating headlight – and that gave rise to a reasonable, articulable suspicion to stop the car. Defendant argues that the evidence regarding the headlight is in dispute and that

the Court should credit the testimony of Ms. Biles. Having credited her testimony, Defendant argues, the Court must conclude there was no headlight issue and thus no valid reason to stop the car.

The law on this point is simple enough. An officer may stop and briefly detain a person for investigative purposes when there is "reasonable suspicion" based on articulable facts, that criminal activity is afoot. <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000); <u>United Sates v. Sokolow</u>, 490 U.S. 1, 7 (1989); <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). To meet the burden, an officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, establish reasonable suspicion of criminal activity. <u>Terry</u>, 392 U.S. at 21. Reasonable suspicion of a traffic violation involving a non-functioning headlight will suffice. <u>See</u>, <u>e.g.</u>, <u>United States v. Jones</u>, 303 F.Supp. 2d 702 (D. Md. 2004) (upholding Maryland traffic stop based on burned-out headlight).

Here, the Court is first called upon to resolve conflicting testimony regarding the headlight of the vehicle driven by Defendant. Respectfully, the Court credits the testimony of the officers over that of Ms. Biles. The officers have no discernible bias, they were at least twice in a very good position to see, and both testified confidently that the headlight was not working and the headlight bezel was missing. With all due respect, Ms. Biles conceded she was a close friend of Defendant, did not want to see him go to prison, and seemed reluctant to be precise about her memory of the headlight. The Government certainly could have made things simpler by taking a photo of the front of the vehicle. Be that as it may, the Court credits the testimony of the officers and concludes, as they stated, that the headlight was not working at the time of the stop.

Having so concluded, it is clear the officers made a proper vehicular stop. Under North Carolina law, it is a traffic violation to fail to have "at least two head lamps, all in good operating

condition with at least one on each side of the front of the motor vehicle." N.C. Gen. Stat. Ann. § 20-129(b) (West 2015). Having observed that the white vehicle was not in compliance with this statute, the officers had reasonable, articulable suspicion to stop the vehicle. The stop of Defendant's vehicle was proper.

**B.     The Officer's Seizure Of The Gun Was Legal Under The Plain View Doctrine**

The second issue presented is whether the officers' seizure of the handgun from the floorboard of Defendant's vehicle was proper under the plain view doctrine. The Government argues that this case presents a textbook application of the three prongs of the plain view doctrine, and further, that it is consistent with an analogous Fourth Circuit case, United States v. Barnes, 153 Fed. Appx. 232 (2005). Defendant argues that the seizure was improper – both because the vehicular stop was improper and because this is not an appropriate application of the plain view doctrine.

Under the plain view doctrine, a warrantless seizure of incriminating evidence is justified when "(1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir. 1997). In United States v. Barnes, 153 Fed. Appx. 232 (2005), an unpublished decision of the Fourth Circuit, the Court stated that "an officer who sees an incriminating object in plain view inside a vehicle during a vehicle stop may seize that object." Id. at 225 (citing Texas v. Brown, 460 U.S. 730, 741 n.6); see also United States v. Davis, 428 Fed. Appx. 255, 256 (4th Cir. 2011) (holding that an officer could seize a firearm protruding from underneath floor mat because incriminating character was immediately apparent as a concealed weapon under North Carolina law). Use of a flashlight

8

does not prevent application of the plain view doctrine. See, e.g., United States v. Dunn, 480 U.S. 294, 305 (1987).

Applying the Jackson factors, these facts present a textbook plain view seizure. These officers were responding to a "shots fired" call when they came upon Defendant's vehicle. They observed that the vehicle generally matched the description of a suspect vehicle and was in clear violation of traffic law. After making a legal stop of the vehicle, the officers were lawfully standing on either side of the vehicle while Officer Kerl talked to Defendant. When Defendant did not produce a driver's license, Officer Kerl had Defendant step out of the vehicle; Defendant was sweating profusely and seemed agitated. Still very much in a lawful position, Officer Varela took one step forward, shone his flashlight into the vehicle, and discovered the partially hidden handgun in the passenger floorboard. This was a proper plain view seizure.

## V. CONCLUSION

The facts and legal issues here are straightforward. Evidence suggests that Defendant's vehicle had a headlight that was not functioning, and thus the officers' stop of the vehicle was supported by reasonable, articulable suspicion, and was therefore proper. Further, the officers' seizure of the handgun from the floorboard of Defendant's vehicle was consistent with the plain view doctrine and therefore permissible.

## VI. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Defendant John Jamar Davis's "Motion to Suppress" (Document No. 18) be **DENIED**.

## VII. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact,

conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenhour, 889 F.2d 1363, 1365 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), reh'g denied, 474 U.S. 1111 (1986).

**IT IS SO RECOMMENDED.**

Signed: September 1, 2016

David C. Keesler
United States Magistrate Judge